1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA NATIVE PLANT SOCIETY,

        Plaintiff,

  v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY,

        Defendant.

_____/

No. C06-03604 MJJ

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW IN SUPPORT
OF ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY
INJUNCTION**

## INTRODUCTION

Before the Court is Plaintiffs California Native Plant Society, Defenders of Wildlife, and

Butte Environmental Council's Motion for Preliminary Injunction.  (Doc. No. 17.)[1]  Defendants

United States Environmental Protection Agency ("EPA"), United State Fish and Wildlife Service

(the "Service"), and United States Army Corps of Engineers (the "Corps") (collectively, the

"Federal Defendants") oppose the motion.  Defendant Intervenors Sunridge-Anatolia, LLC, Arista

Del Sol, LP, CP Sunridge, LLC, Danville Land Investments, LLC, Douglas Grantline 103 Investors,

LLC, and Cresleigh Homes (collectively, "Defendant Intervenors") also oppose the motion.

Plaintiffs have sued the Federal Defendants to challenge a "June 2004 Conceptual Level

Strategy for Avoiding, Minimizing, & Preserving Aquatic Resource Habitat in the Sunrise-Douglas

Community Plan Area" ("Conceptual Strategy"), which Plaintiffs contend the Federal Defendants

---

[1]Plaintiff filed an Amended Memorandum of Points and Authorities in support of their Motion for Preliminary
Injunction on November 16, 2006.  (Doc. No. 78.)

improperly rely on in issuing permits for development projects in the Sunrise-Douglas Community

Plan Area.  (First Amended Complaint ("FAC") ¶ 1.)  In particular, Plaintiff contend that the Federal

Defendants did not subject the Conceptual Strategy to the environmental review processes mandated

by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, or the "consultation"

procedures required by section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. §

1536(a)(2).  (*Id.*)  Plaintiffs allege four causes of action: (1) Violation of NEPA in Adopting Strategy

and Plan Against all Defendants; (2) Violation of NEPA for Unlawful Environmental Assessments

Against the Corps; (3) Violation of ESA Consultation Requirements Against all Defendants; and (4)

Violation of ESA for Unlawful Biological Opinions Against the Service.  Plaintiffs seek declaratory

and injunctive relief to remedy the alleged violations of law.

On October 16, 2006, Plaintiffs filed a Motion for a Temporary Restraining Order, which the

Court denied.  (Doc. No. 73 ("Order Denying TRO Motion").)  In brief, the Court found that

Plaintiffs had not shown any likelihood of succeeding on their first claim because Plaintiffs had

failed to present any argument or evidence suggesting that the Conservation Strategy constitutes

final agency action under the Administrative Procedure Act ("APA").  (*Id.* at 422-5:4.)  As to claim

two, the Court found that Plaintiffs had raised a serious question that the issuance and subsequent

use and reliance on the Conservation Strategy amounts to final agency action, and made at least a

colorable argument that the Corps' use of the Strategy in evaluating and issuing permits amounts to

major federal action triggering NEPA.  (*Id.* at 6:25-7:2, 8:6-9.)  The Court, however, found that on

the record before it, Plaintiffs had failed to raise a serious question as to whether the Federal

Defendants has violated NEPA's procedural requirements.  (*Id.* at 9:13-15.)  The Court likewise

found that Plaintiffs had failed to raise a serious question that the Conservation Strategy amounted to

agency action triggering the ESA's consultation procedures.  (*Id.* at 11:20-23.)  Finally, the Court

found that Plaintiffs had not shown a likelihood of succeeding on their fourth claim since Plaintiffs

had failed to comply with the ESA's 60-day notice provision as to some of the challenged permits,

and had failed to plead their challenges to the biological opinions regarding the four projects they

then sought to enjoin.  (*Id.* at 19-23.)

On December 1, 2006, the Court conducted a hearing on Plaintiffs' Motion for Preliminary

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   Injunction.  Plaintiffs were represented by Craig H. Segall and Deborah A. Sivas of the Stanford

2   Environmental Law Clinic.  The Federal Defendants were represented by Carol Draper and Rebecca

3   J. Riley of the U.S. Department of Justice.  The Defendant Intervenors were represented by Robert J.

4   Uram of Sheppard, Mullin, Richter & Hampton, LLP, and Andrew B. Sabey of Morrison & Foerster,

5   LLP.  All parties submitted proposed findings of fact and conclusions of law.  Having considered the

6   parties' arguments, pleadings, and the evidentiary record, the Court now enters the following

7   Findings of Fact, and renders its Conclusions of Law.

**FINDINGS OF FACT**

8

9   **I.     Background**

10          1.  The Sunrise Douglas Community Planning Area (the "SDCPA") is located in the City of

11   Rancho Cordova (the "City"), located in Southern Sacramento County, California, and covers

12   approximately 6,042 acres.  (Uram Decl. Exh. 2 at i.)

13          2.  The SDCPA overlaps the Mather Core Recovery Unit, an area designated by the U.S. Fish

14   and Wildlife Service ("Service") in its Recovery Plan for Vernal Pool Ecosystems in California and

15   Southern Oregon ("Recovery Plan") as important to the survival and recovery of at least four

16   threatened and endangered species native to vernal pools.  (Segall Decl. Exh. A at III-5-6, III-68,

17   III-85.)  The Recovery Plan was issued by the Service on March 24, 2006.  (Uram Decl. Exh. 4.)

18          3.  These species are the vernal pool fairy shrimp (*Branchinecta lynchi*), listed as threatened

19   under the Endangered Species Act ("ESA"), the vernal pool tadpole shrimp (*Lepidarus packardi*),

20   listed as endangered, the slender Orcutt grass (*Orcuttia tenuis*), listed as threatened, and the

21   Sacramento Orcutt grass (*Orcuttia viscida*), listed as endangered.  *See* 59 Fed. Reg. 48,136 (Sept. 19,

22   1994); 63 Fed. Reg. 14,338 (Mar. 26, 1997).

23          4.  Initially begun by the County of Sacramento and continued by the City following its

24   incorporation in 2002, the SDCPA has been the subject of an ongoing land use planning process.

25   (Declaration of Craig Segall, dated December [sic] 15, 2006 ("Second Segall Decl.") Exh. 1 at 2.)

26          5.  This process culminated with the creation of the Sunrise-Douglas Community Plan (the

27   "Community Plan"), a programmatic land use plan covering the entire SDCPA, and the preparation

28   of an environmental impact report ("EIR") pursuant to the California Environmental Quality Act

United States District Court

For the Northern District of California

("CEQA"), addressing the potential environmental effects of the Community Plan's implementation. (Uram Decl. Exh 2.)  The Sunridge Specific Planning Area (the "SRSPA") is a 2,632-acre subset of the SDCPA.  (*Id.* Exh. 2 at i.)  The County prepared the Sunridge Specific Plan, a more focused document covering land uses within the smaller SRSPA.  (*Id.*)  The County's EIR also studied the potential environmental effects of the Specific Plan's implementation.  (Segall Decl. Exh. I at 2-3; Uram Decl. Exh 2.)

6. A portion of the SRSPA had also been the subject of a prior, joint environmental impact report ("EIR)/environmental impact statement ("EIS") prepared by the County and the Corps pursuant to CEQA and NEPA.  The joint EIR/EIS, published in January, 1992, studied the environmental effects of development on approximately 1,225 acres of the SRSPA.  (Second Segall Decl. Exh. 4 at 2-3; Uram Decl. Exh. 1.).  The Corps issued a permit for that project in 1996 and all work under that permit has been completed.  That project resulted in the permanent preservation of a 482 acre vernal pool complex.  This project is sometimes referred to as Anatolia I, II, and III.  (*Id.*)

7. The SRSPA subarea that is the subject of this litigation consists of the following projects: North Douglas, Montelena, Sunridge Park, Douglas Road 98, Sunridge Village J, Anatolia IV, Grantline 208, Arista del Sol, and Douglas Road 103.

8. The Corps and City of Rancho Cordova are preparing a joint EIR/EIS for the SunCreek Specific Plan Area of the SDCPA.  (*See e.g.*, Second Segall Decl. Exh. 1 at 5.)

9. Because the planned development affected vernal pools and listed species, after the Sunridge Specific Plan was approved, the landowners within the Sunridge Specific Plan subareas, acting individually, applied to the Corps for permission to fill vernal pools and other waters of the United States on their properties, pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1344. (Roukey Decl. Exhs. A-1, D.)  The landowners also sought authorization from the United States Fish and Wildlife Service (the "Service") pursuant to the ESA (16 U.S.C. § 1536 and 1539), since they had varying acreages of listed vernal pool species habitat within their properties.

**II.     The Conceptual Strategy**

1. In March 2004, then-Congressman Doug Ose initiated meetings between the U.S. Environmental Protection Agency ("EPA"), the Corps, and the Service, local agencies, and

United States District Court

For the Northern District of California

landowners and developers.  These meetings were intended to provide the parties with an opportunity to work cooperatively to develop a conceptual onsite avoidance, and offsite compensation strategy that balanced environmental and development interests.  (*See e.g.*, Segall Decl. Exh. E at 3, Exh. F at 2-3.)  The public was not notified of the meetings, invited to participate, or given a chance to comment on documents in the development stage.  (Witham Decl. at ¶ 11; Segall Decl., Exh. E at 3.)

2.  The meetings resulted in the issuance the two page Conceptual Strategy, dated June 2004. The Conceptual Strategy sets forth ten principles for development of the SDCPA: (1) maintain natural (existing) watershed integrity; (2) maintain corridors and large areas for wildlife and the propagation of flora; (3) manage storm water to retain natural flow and water quality; (4) elevate roads and use similar strategies for transportation corridors to minimize direct and indirect impact on aquatic resources; (5) use conservation design elements; (6) locate compatible land uses next to preserves; (7) locate mow-only firebreaks on the edges of preserve areas; (8) ensure that preservation areas are protected in perpetuity; (9) implement mitigation measures (avoidance, minimization, and compensation) to offset direct and indirect impacts on aquatic resources and listed species; and (10) recognize the realities and constraints placed on construction design due to infrastructure and market-driven forces.  (Segall Decl. Exh. B.)  The Conceptual Strategy also included a preserve map dated March 8, 2004, and indicated that the mapped boundaries were the smallest that would be acceptable to the Federal Defendants.  (*Id.*).

3.  The Conceptual Strategy states that it "should be used by developers and planners to design and plan projects within the SDCPA."  Further, '[t]he Agencies will use the strategy to aid in the review of proposed development and evaluate the probable individual and cumulative effects on aquatic resources and sensitive species."  However, permit decisions and biological opinions would be considered "on a case-by-case basis, using site-specific project and aquatic resource habitat information."  (Segall Decl. Exh. B.)

4.  On September 13, 2004, Paul Jones, a Life Scientist at the EPA sent an email to Eva Butler at the California Native Plant Society to invite her, Carol Witham, and others of their choice, to meet with representatives of the Corps, Service, and EPA on September 29, 2004 to discuss the

status of the Sunrise Douglas permitting issues and to get feedback on the preserve size and configuration.  (Jones Decl. Exh. A.).  The purpose of the meeting was to "inform the environmental representatives about the federal agencies' discussions with developers and landowners, to solicit their input and to invite them to participate in the Sunrise Douglas Community Plan process."  (*Id.* at ¶ 3.)

5.  The meeting ultimately took place at the California Native Plant Society's office on September 29, 2004, before any of the permits or Biological Opinions plaintiffs challenge in this action were issued.  Representatives of the CNPS (Ms. Butler and Ms. Witham), the Institute for Ecological Health, the EPA, and the Corps attended the meeting.  (Jones Decl. ¶ 3, Exh. A.)  During this meeting, Mr. Jones shared the Conceptual Strategy with the environmental representatives.

6.  The Conceptual Strategy had not been subject to NEPA procedures.

### III.   Public Notices

1.  On February 6, 2004, the Corps issued a Public Notice 200000336 for five of the applications - DJ Enterprises (now known as Montelana), North Douglas and North Douglas 2 (now combined and known collectively as "North Douglas"), Anatolia IV, and Douglas Road 98.  The public notice identified three other pending applications in the area:  Sunridge Village J, Ronenberg (now known as Sunridge Park), and Douglas Road 103.  For all these applications, the Corps provided the public with information on the anticipated impacts and the location of the impacts.  The notice stated that the proposed projects would cause 31 acres of impacts to wetlands.  It also noted that the Corps expected an additional application for this area and that additional impacts could occur in what the public notice referred to as the Sunrise Douglas II area (now known as SunCreek). The public notice summarized the past Corps permits issued in this area (Anatolia I, II, and III) and referenced the prior EIS it had prepared for that permit.  In addition, it provided information on impacts and maps for Village J, Ronenberg (now known as Sunridge Park) and Douglas Road 103, and said that the total impacts for the Community Plan area could be as much as 203 acres.  (Roukey Decl. Exh. A-1.)

2.  Each of the plaintiffs responded to this Public Notice 200000336.  The California Native Plant Society commented on March 30, 2004.  The Butte Environmental Council and Defenders of

1   Wildlife commented on April 24, 2004.  (Rourkey Decl. Exh. A-1, B.)

2       3.  On September 30, 2004, the Corps issued Public Notice 200400458 for the Arista del Sol

3   project and Public Notice 199400365 for Grantline 208.  (Roukey Decl. Exhs. E & G.)  In those

4   Public Notices, the Corps noted that the three federal agencies had developed a Conceptual Strategy

5   in June of 2004 and asked for comments on whether an EA or EIS should be prepared.  The

6   Conceptual Strategy map was attached to the notice along with information on the size of the

7   preserve.  (*Id.*)  The California Native Plant Society commented on this notice and stated its view

8   that the Conceptual Strategy did not provide sufficient protection for the vernal pools in the area.

9   (Roukey Decl. Exh. B.)

10  **IV.    The Regional Alternatives Analysis**

11      1.  On November 29, 2004, at the request of the Corps, seven permit applicants jointly

12  prepared and submitted a document entitled, *Regional Alternatives Information for the Sunridge*

13  *Specific Plan Subarea, Sacramento County, California* (the "Regional Alternatives Analysis").

14  (Uram Decl. Exh. 3 at 3.)

15      2.  The Regional Alternatives Analysis states, "the purpose of this regional analysis is to

16  assess the indirect and cumulative effects on the aquatic environment and on habitat for federally

17  listed species for a variety of alternatives within the Plan Subarea.  Each project within the Plan

18  Subarea will do its own Section 404(b)(1) alternatives analysis.  This Subarea analysis allows for a

19  comprehensive consideration of cumulative and indirect impacts."  (Uram Decl. Exh. 3 at 19.)  The

20  "Plan Subarea" is "the following project sites within the larger SRSPA:  Anatolia IV, Sunridge

21  Ranch [Montelena], Sunridge Village J, Sunridge Park, Douglas 103, Douglas 98, North Douglas,

22  Geisreiter, and [Arista del Sol]."  (*Id.* at 6.)

23      3.  The Regional Alternatives Analysis relied on and discussed at length an October 10, 1994

24  Off-Site Alternatives Analysis, which evaluated the practicality of off-site alternatives.  The

25  Regional Alternatives Analysis explains that there was no new information to refute the findings of

26  the 1994 Analysis and no additional properties had become available in the interim. (Uram Decl.,

27  Exh. 3 at 19.)

28      4.  The Regional Alternatives Analysis also evaluated ten different on-site preserve

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

configurations - including the one set forth in the Conceptual Strategy's preserve map - based on several criteria, including direct, indirect, and cumulative impacts on vernal pools and other wetlands; preserve and development acreages; vernal pool habitat and buffer zones; and project costs per net developable acre. (Uram Decl., Exh. 3 at pp. 22 *et seq.*) Each alternative considered was described both qualitatively and quantitatively. A quantitative analysis was performed for direct impacts, indirect impacts, land affected, land preserved, and perimeter ratio of the preserve areas (to assess the effectiveness of long term protection). (*Id.* at p. 23 (table 2 quantifying each alternative's impact on wetlands), p. 24 (table 3 quantifying the preserve and development acreage for each alternative), p. 25 (table 4 quantifying the percentage of vernal pool habitat not indirectly impacted under each alternative), p. 26 (table 5 quantifying project costs per net developable acre for each alternative), p. 45 (table 6 outlining the practicability of each alternative according to all of the above criteria. The Regional Alternatives Analysis also contains a narrative analysis of each alternative and explains why that alternative satisfies or does not satisfy each of listed criteria. (*Id.* at 28-44.)

5. The Regional Alternatives Analysis concluded that implementation of the preserve proposed by the Conceptual Strategy "would result in no net loss of acreage and functions and values of wetlands and other aquatic resources." Further, "[m]itigation would compensate for unavoidable impacts and overall adverse direct, and indirect, and cumulative impacts would not be significant." (Uram Decl. Exh. 3 at 43.)

6. The Regional Alternatives Analysis has not been subjected to NEPA procedures.

**V.    Project Specific Information**

1. The record before the Court also contains the following project-specific documentation.

**A.    Anatolia IV**

a. The applicant submitted a "Clean Water Act § 404(b)(1) Alternatives Analysis and On-Site Minimization Measures" ("Section 404(b)(1) Analysis"), which summarizes the Regional Alternatives Analysis, described how the proposed project was consistent with the principals set forth in the Conceptual Strategy, and described measures intended to mitigate impacts to wetlands within the adjacent preserves and/or properties. (Uram Decl. Exh. 5.) The applicant supplemented

United States District Court

For the Northern District of California

1   the Section 404(b)(1) Analysis with an on-site alternatives analysis, which evaluates the proposed

2   project, a no-fill alternative, and partial fill alternative with respect to several criteria, including

3   consistency with the principals of the Conceptual Strategy.  (*Id*. Exh. 6.)

4        b.  The applicant also submitted a Biological Assessment ("BA") pursuant to section 1536(c)

5   of the ESA which describes the history of consultation, the project, the status of species in the

6   development area, and the direct, indirect, and cumulative effects of the proposed project.  (Uram

7   Decl. Exh. 7.)  The BA suggests that the direct effects - filing of vernal pools - will be offset by

8   mitigation.  The BA states that the Service considers vernal pool habitat within 250 feet of

9   construction to be indirectly impacted, that a road to the east creates a hydologic barrier to habitat to

10  the east, that impacted habitat to the south would be "directly removed and offset by adjacent

11  proposed development," and loss of vernal pools in the north and west would be addressed through

12  separate section & consultation.  Regarding cumulative effects, the BA notes that future projects

13  subject to the section 404 permitting process would be subject to separate section 7 consultation and

14  would not be considered cumulative under the ESA.  (*Id.* at 18-20.)

15       **B.      Arista Del Sol**

16       a.  The applicant submitted a BA pursuant to section 1536(c) of the ESA which describes the

17  history of consultation, the project, the status of species in the development area, and the direct,

18  indirect, and cumulative effects of the proposed project.  (Uram Decl. Exh. 8.)  The BA suggests that

19  direct, indirect, and cumulative effects on vernal pools will be addressed and offset by the

20  Conceptual Strategy preserve and mitigation.  (*Id.* at 17-20.)

21       **C.      Douglas Road 98**

22       a.  The applicant submitted a section 404(b)(1) alternatives submission which analyzes the

23  proposed project, a no-fill alternative, and a partial fill alternative with respect to several criteria.

24  (Birkey Decl. Exh. D.)  It states that the Corps and EPA evaluated the Conceptual Strategy preserve

25  within the context of the Regional Alternatives Analysis, and these agencies confirmed that the

26  Conceptual Strategy preserve was the least environmentally damaging practical alternate.  However,

27  the Conceptual Strategy contemplates that additional information may be necessary based on site

28  specific conditions to ensure compliance with the Conceptual Strategy, and the Supplement

**United States District Court**
For the Northern District of California

1   Alternatives submission was intended to provide the additional information requested.  (*Id.*)

2       b.  In addition, the applicant submitted a BA pursuant to section 1536(c) of the ESA which

3   describes the history of consultation, the project, the status of species in the development area, and

4   the direct, indirect, and cumulative effects of the proposed project.  (Birkey Decl. Exh. F.)  The BA

5   suggests that direct impacts will be addressed through preservation and mitigation, and indirect

6   impacts will be addressed through the separate section 7 consultation process for adjacent projects

7   and mitigation.  Moreover, since future projects that are subject to the section 404 permitting process

8   will also be subject to separate section 7 consultation, the effects of such projects are not cumulative

9   under the ESA.  (*Id.* at 18-20.)

10      **C.      Douglas 103**

11      a.  The applicant submitted a section 404(b)(1) Supplemental Alternatives analysis which

12  evaluates the proposed project, a full avoidance alternative, a partial avoidance alternative, and a full

13  impact alternative.  (Birkey Decl. Exh. I.)  It also states that the Corps and EPA evaluated the

14  Conceptual Strategy preserve within the context of the Regional Alternatives Analysis, and these

15  agencies confirmed that the Conceptual Strategy preserve was the least environmentally damaging

16  practical alternate.  However, the Conceptual Strategy contemplates that additional information may

17  be necessary based on site specific conditions to ensure compliance with the Conceptual Strategy,

18  and the Supplement Alternatives submission was intended to provide the additional information

19  requested.  (*Id.*)

20      b.  The applicant submitted a BA pursuant to section 1536(c) of the ESA which describes the

21  history of consultation, the project, the status of species in the development area, and the direct,

22  indirect, and cumulative effects of the proposed project.  (Birkey Decl. Exh. K.)  The BA states that

23  these impacts will be addressed through preservation and mitigation, including the measures set

24  forth in the Conceptual Strategy.  (*Id.* at 17-20.)

25      **D.      Grantline 208**

26      a.  The applicant submitted a section 404(b)(1) Supplemental Alternatives Analysis that

27  evaluates the proposed project, a full avoidance alternative, a partial avoidance alternative, and a full

28  impact alternative.  (Birkey Decl. Exh. M.)  It also indicates that the Corps and EPA evaluated the

**United States District Court**
For the Northern District of California

1    Conceptual Strategy preserve within the context of the Regional Alternatives Analysis, and these

2    agencies confirmed that the Conceptual Strategy preserve was the least environmentally damaging

3    practical alternate.  However, the Conceptual Strategy contemplates that additional information may

4    be necessary based on site specific conditions to ensure compliance with the Conceptual Strategy,

5    and the Supplement Alternatives submission was intended to provide the additional information

6    requested.  (*Id.*)

7         b.  The applicant submitted a BA pursuant to section 1536(c) of the ESA which describes the

8    history of consultation, the project, the status of species in the development area, and the direct,

9    indirect, and cumulative effects of the proposed project.  (Birkey Decl. Exh. P.)  The BA discusses

10   direct, indirect, and cumulative impacts, and states that these impacts will be addressed through

11   preservation and mitigation, including the measures set forth in the Conceptual Strategy.  (*Id.* at 17-

12   20.)  Also, indirect impacts will be addressed through the separate section 7 consultation processes

13   for adjacent projects.  (*Id.* at 17-18.)

14        **E.    Sunridge Village J**

15        a.  The applicant submitted a section 404(b)(1) Supplemental Alternatives submission that

16   analyzes the proposed project, a no-fill alternative, and a partial fill alternative with respect to

17   several criteria.  (Uram Decl., Exh. V.)  It also indicates that the Corps and EPA evaluated the

18   Conceptual Strategy preserve within the context of the Regional Alternatives Analysis, and these

19   agencies confirmed that the Conceptual Strategy preserve was the least environmentally damaging

20   practical alternative.  However, the Conceptual Strategy contemplates that additional information

21   may be necessary based on site specific conditions to ensure compliance with the Conceptual

22   Strategy, and the Supplement Alternatives submission was intended to provide the additional

23   information requested.  (*Id.*)

24        b.  The applicant also provided a BA pursuant to section 1536(c) of the ESA which describes

25   the history of consultation, the project, the status of species in the development area, and the direct,

26   indirect, and cumulative effects of the proposed project.  (Birkey Decl. Exh. X.)  The BA discusses

27   direct and indirect impacts, and states that these impacts will be addressed through preservation and

28   mitigation.  (*Id.* at 17-20.)  Also, indirect impacts and cumulative impacts will be addressed through

**United States District Court**
For the Northern District of California

1    the separate section 7 consultation processes for adjacent projects.   (*Id.* at 17-18.)

2         **F.    Montelena**

3         a.  The applicant submitted section 404(b)(1) alternatives analyses that considered eight on-

4    site avoidance alternatives, six of which were fully evaluated.  This alternates analysis also

5    discussed the proposed project within the Conceptual Strategy framework and analyzed its level of

6    compliance with the principles and preserve map.  (Ness Decl. Exh. D)

7         **G.    North Douglas**

8         a.  The applicant submitted a section 404(b)(1) alternatives analysis, in which the applicant

9    considered other project sites within the Specific Plan Area, and evaluated three onsite design

10   alternatives including the proposed project.  The analysis also discussed the project within the

11   framework of the principals and guidelines of the Conceptual Strategy.  (Ness Decl. Exh. C.)

12        **H.    Sunridge Park**

13        a.  According to the Corps' EA, the applicant submitted section 404(b)(1) alternatives

14   analyses, which evaluated three on-site design alternatives, including a no-action alternative, a

15   partial avoidance alternative and the proposed project.  (Second Segal Decl. Exh. 3 at 10.)  The

16   analyses also considered eight off-site alternatives within the SRSPA, and discussed the project

17   within the framework of the Conceptual Strategy.  (*Id.* at 12.)

18   **VI.    The Biological Opinions ("BiOps") and Incidental Take Statements ("ITS")**

19        1.  In response to the Corps' request for consultation under section 7 of the ESA for the

20   projects at issue here, beginning in December 2004, the Service issued Biological Opinions and

21   Incidental Take Statements for each of the projects.  (Segall Decl. Exh. E (North Douglas, December

22   9, 2004), Exh. K at 3 (Sunridge Park, January 7, 2005), Exh. M at 3 (Douglas Road 103, March 16,

23   2006), Exh. N at 3 (Grantline 208, March 18, 2006), Exh. O at 3 (Arista Del Sol, June 28, 2006),

24   Exh. P at 3 (Anatolia IV, December 9, 2004); Exh. Q at 3 (Sunridge Village J, December 22, 2004)

25   Exh. R (Douglas Road 98, January 12, 2005), Exh. S (Montelena, December 9, 2004.)

26        2.  For each project, it was the Services' biological opinion that the project as proposed was

27   not likely to jeopardize the continued existence of the vernal pool fairy shrimp and vernal pool

28   tadpole shrimp.  However, each BiOp included a series of "reasonable and prudent measures" that

**United States District Court**

For the Northern District of California

applicants were required to implement to minimize the impact of the proposed projects.  Further, each BiOp issued after the Recovery Plan contains a conservation recommendation for the Corps to work with the Service to implement the Recovery Plan.  (Segall Decl., Exh. M at 22, Exh. N at 28, Exh. O at 29.)

**VII.    The Environmental Assessments ("EA") and Findings Of No Significant Impact ("FONSI")**

1.  At the time of the hearing on this Motion, the Arista Del Sol and Douglas Road 103 EAs had not yet been issued.   The Corps, however, issued EAs and FONSIs for the seven other projects subject to this lawsuit: Douglas Road 98 (Second Segall Decl. Exh. 1); Montelena (*Id.* Exh. 2); Sunridge Park (*Id.* Exh. 3); Anatolia IV (*Id.* Exh. 4); Sunridge Village J (*Id.* Exh. 5); North Douglas (Segall Decl. Exh. I); and Grantline 208 (Birkey Decl. Exh. O.)

2.  Because the EA/FONSIs for each project contain substantially similar information about each project, the Court discusses the following EA/FONSIs in detail as typical of all of the EA/FONSIs issued, with a focus on portions of the EA/FONSIs related to alternatives and cumulative impacts effecting vernal pools and wetlands.

**A.    Grantline 208**

a.  The EA explicitly incorporates by reference, among other documents, the Regional Alternatives Analysis, and the Grantline 208 Section 404(b)(1) Supplemental Alternatives Analysis.  (Birkey Decl. Exh. O at 1.)  The EA briefly discusses the 1992 EIS/EIR, and the Community Plan EIR, and summarizes the Conceptual Strategy.  (*Id.* at 2-5.)

b.  The EA sets forth the impacts of the project on jurisdictional waters of the United States. Specifically, the project site contains approximately 11.10 acres of waters, including 10.07 acres of vernal pools, 0.05 acres of depressional seasonal wetland, 0.66 acres of rivertine seasonal wetlands, 0.08 acres of seasonal marsh, and 0.24 acres of ephemeral drainage.  (*Id.* at 6.)  Further, the project would result in the fill of 5.70 acres of waters, including 5.22 acres of vernal pools, 0.04 acres of depressional seasonal wetland, 0.36 acres of rivertine seasonal wetland, and 0.08 acres of ephemeral drainage.  In addition, there were 0.45 acres of vernal pools and seasonal wetlands that had upland buffers of less than 250 feet and could be adversely impacted by the project.  (*Id.*)

c. The EA also mentions that the Regional Alternatives Analysis was meant to identify regional and sub-regional cumulative impacts that may reasonably be expected to occur based on the Conceptual Reserve Plan developed by the Agencies, and analyzed the Conceptual Reserve and eight other reserve configurations according to criteria for minimizing jurisdictional impacts and creating reserve areas. (*Id.* at 5.)  The Corps preliminarily determined, as "discussed" in Section F of the EA,  that the projects would not likely have significant cumulative impacts if they were developed consistent with the Conceptual Strategy. (*Id.*)

d. In Section F, the Corps acknowledged that other projects in the SRSPA were reasonably foreseeable, and in light of a number of factors, it was reasonable to assume that the cumulative effects of the projects were related. (*Id.* at 22.)  Section F notes that the Conceptual Strategy and the Regional Alternatives Analysis address potential cumulative impacts, and explains how the implementation of the Conceptual Strategy would sufficiently mitigate cumulative impacts such that the proposed projects would have not have a significant impact on vernal pools. (*Id.* at 22-23.)  The Corps determined that future development projects in the SunCreek area were too speculative to consider, and noted that a joint EIS/EIR was being prepared for the SunCreek area. (*Id.* at 23.)

e. The EA also summarizes each of the on-site development alternatives evaluated in the applicant's Supplemental Alternatives Analysis.  The no-action alternative rendered the project impractical and did not leave enough contiguous land to construct the development. (*Id.* at 8.)  The partial avoidance alternative would result in a preserve that ran counter to the intentions of the Conceptual Strategy, and the full impact alternative was rejected since the there was an alternative with a lesser environmental impact. (*Id.* at 9.)  The EA also notes that the applicant designed the Grantline 208 project "to comply with the Conceptual Strategy and associated Preserve Map." (*Id.*)  The Corps' selected alternative was the applicant's preferred alternative with the addition of 20 special conditions. (*Id.* at 9-13.)

f. In addition, the EA discussed a number of "Physical/Chemical Characteristic and Anticipated Changes," "Biological Characteristics and Anticipated Changes," and "Human Use Characteristics and Impacts." (*Id.* at 13-21.)  Of particular relevance, the EA acknowledges impacts to vernal pools and seasonal wetlands, and discusses the applicant's proposed mitigation plan to

United States District Court

For the Northern District of California

offset impacts.  (*Id.* at 15-16.)  The EA also notes that the project would affect the habitat of the federally listed vernal pool fairy shrimp and tadpole shrimp, but concludes that the restoration and preservation will adequately mitigate adverse effects to a less than significant level.  (*Id.* at 16.)  Finally, the EA acknowledges that the wetlands and vernal pools on the project site were presumed to harbor the threatened fairly shrimp and endangered tadpole shrimp.  However, the Service, as set forth in its BiOp, determined that the fill activities would not jeopardize the continued existence of the listed species, "because mitigation proposed as part of the project, plus compliance with Agencies' Conceptual Strategy and Conceptual Preserve Map would offset impacts to listed species and their habitats."  (*Id.* at 17.)  The Corps, "[b]ased on the conclusions of the no-jeopardy opinion, and the likelihood of success of planned mitigation," concluded that the proposed project would not have significant impacts on endangered or threatened species, "as mitigated."  (*Id.*)

g.  Finally the EA addresses comments received in response to the public notice concerning the permit application.  (*Id.* at 24-42.)

**B.      Sunridge Park**

a.  The EA expressly incorporates by reference, among other documents,  the Regional Alternatives Analysis, a January 12, 2005, Clean Water Act Section 404(b)(1) Alternatives Analysis and On-Site Minimization Measures, and a May 23, 2005, 404(b)(1) Alternatives Analysis for the Sunridge Park Property.  (Second Segall Decl., Exh. 3 at 1.)  The EA briefly discusses the 1992 EIS/EIR, and the Community Plan EIR, as well as the Conceptual Strategy.  (*Id.* at 2-5.)

b.  The EA documents that the project would permanently impact 1.81 acres of jurisidicational waters, and the fill associated with the project would result in the loss of 0.22 acres of depressional seasonal wetlands, 0.27 acres of rivertine seasonal wetlands, and 1.31 acres of vernal pools.  Moreover, the construction of the off-site discharge channel to the south would impact "0.01 acre of an existing off-site intermittent drainage."  (*Id.* at 7.)  The project would also preserve 0.19 acres of waters, including 0.05 acres of vernal pool, 0.02 acres of wetland, and 0.12 acres of ephemeral tributary to Morrison Creek within a 6.4-acre on-site preserve.  Finally, the project had the potential to indirectly impact 1.58 acres of vernal pools within 250 feet of the project footprint.  (*Id.*)

United States District Court

For the Northern District of California

c. The EA also states that the Regional Alternatives Analysis was meant to identify regional and sub-regional cumulative impacts that may reasonably be expected to occur based on the Conceptual Reserve Plan developed by the Agencies, and analyzed the Conceptual Reserve and eight other reserve configurations according to criteria for minimizing jurisdictional impacts and creating reserve areas. (*Id.* at 6.) The Corps preliminarily determined, as "discussed" in Section F of the EA, that the projects would not likely have significant cumulative impacts if they were developed consistent with the Conceptual Strategy. (*Id.* at 6-7.)

d. In Section F, the Corps acknowledged that other projects in the Sunridge Specific Plan Area were reasonably foreseeable, and in light of a number of factors, it was reasonable to assume that the cumulative effects of the projects were related. (*Id.* at 27.) Section F notes that the Conceptual Strategy and the Regional Alternatives Analysis address potential cumulative impacts, and explains how the implementation of the Conceptual Strategy would sufficiently mitigate cumulative impacts such that the proposed projects would have not have a significant impact on vernal pools. (*Id.* at 27-28.)[2] The Corps determined that future development projects in the SunCreek area were too speculative to consider, and noted that a joint EIS/EIR was being prepared for the SunCreek area. (*Id.* at 28.)

e. The EA also summarizes each of the three on-site development alternatives evaluated in the applicant's Supplemental Alternatives Analyses. The EA notes that the no-action alternative is,

---

[2]More specifically, the EA notes that consistency with the Conceptual Strategy was estimated to result in the protection of more than 50 percent of the waters in the Community Planning Area, thereby reducing adverse cumulative impacts as compared to the implementation of the original Specific Plan. The EA states that other benefits of the Conceptual Strategy include: identifying avoidance areas in a manner that minimizes edge-to-area ratios; coalescing individual projects' avoidance and minimization efforts into a regional reserve designed to connect to the previously approved and existing Anatolia Preserve, thereby increasing connectivity between project avoidance areas and connectivity to downstream wetlands and vernal pools; and creating intact corridors supporting the Morrison Creek and Laguna Creek watersheds and associated vernal pools in the Specific Plan area. The Conceptual Strategy also set forth principles and standards for development of uplands surrounding the avoided wetlands and vernal pools that would reduce urban edge effects on these areas and promote long-term retention of wetland and vernal pool functions and values. Finally the Conceptual Strategy requires monitoring and management in perpetuity according to a preserve management plan to be submitted for federal agency approval. The measures specified in the Conceptual Strategy for the creation of a reserve according to the Conceptual Reserve map would avoid cumulatively significant impacts to jurisdictional wetlands and vernal pools within the Specific Plan area, but more importantly would result in preservation of functions and values of the remaining vernal pools, wetlands and other jurisdictional waters of the U.S. in the Community Planning Area." (Second Segall Decl. Exh. 3 at 27-28.) Each EA contains a similarly worded analysis. (*See Id.* Exh. 1 at 21 [Douglas Road 98], Exh. 2 at 27-28 [Montelena], Exh. 4 at 16-17 [Anatolia IV], Exh. 5 at 14 [Sunridge Village J], Segall Decl. Exh. I at 18-19 [North Douglas], Birkey Decl. Exh. O at 22-23 [Grantline 208].)

16

among other things,  not consistent with the Conceptual Strategy or the Conceptual Reserve design. (*Id.* at 11.)  Similarly, the partial avoidance alternative, in addition to being impracticable, was inconsistent with the Conceptual Strategy.  (*Id.* at 12.)  The project as proposed, however, was consistent with the Conceptual Strategy and associated Reserve Map.  (*Id.*)  The Corps determined that the applicant's preferred alternative was the least environmentally damaging with the inclusion of 23 special conditions.  (*Id.* at 12-17.)

f.  In addition, the EA discusses anticipated "Physical/Chemical Characteristic and Anticipated Changes," "Biological Characteristics and Anticipated Changes," and "Human Use Characteristics and Impacts."  (*Id.* at 17-26.)  As is pertinent here, the EA notes the direct, permanent impacts to vernal pools, depressed seasonal wetlands, and riverine seasonal wetlands, and discusses the applicant's proposed mitigation plan to offset impacts.  (*Id.* at 20-21.)  The EA also notes that on-site wetland and vernal pool habitat for federally listed vernal pool fairy shrimp and tadpole shrimp would be adversely affected by the proposed project, and concludes that the propose restoration, creation, and preservation plan would adequately mitigate adverse effects.  (*Id.* at 21.)  Finally, the EA acknowledges that the wetlands and vernal pools on the project site were presumed to harbor the threatened fairly shrimp and endangered tadpole shrimp.  However, the Service, as set forth in its Biological Opinion, determined that the fill activities would not jeopardize the continued existence of the listed species, "in part because mitigation proposed as part of the project, plus compliancy with Agencies' Conceptual Strategy and Conceptual Reserve Map would mitigate impacts to the listed species and their habitats."  (*Id.* at 22.)  The Corps, "[b]ased on the conclusions of the no-jeopardy opinion, and the potential success of the planned mitigation," concluded that the proposed project had less than significant impacts on endangered or threatened species.  (*Id.*)

g.  Finally, the EA addresses comments received in response to the public notice concerning the permit application.  (*Id.* at 29-32.)

## VIII.   The Section 404 Permits

1.  The Corps issued the following section 404 Permits: North Douglas (Segall Decl., Exh. I); Montelena (Second Segall Decl., Exh. 2); Douglas Road 98 (*Id.*, Exh. 1); Sunridge Park (*Id.*, Exh. 3); Anatolia IV (*Id.*, Exh. 4); Sunridge Village J (*Id.*, Exh. 5); and Grantline 208 (Birkey Decl., Exh.

**United States District Court**

For the Northern District of California

1   O).  Each permit imposed a number of special conditions on the project designed to ensure adequate

2   mitigation through preservation, restoration, and creation of habitat that would be directly and

3   indirectly impacted by the project.  At the time this Motion was heard, the permit applications for

4   the Douglas Road 103 and Arista Del Sol projects were still pending.

5           2.  The EPA did not elevate for higher review any of the section 404 Permits issued.

6                                      **CONCLUSIONS OF LAW**

7   **I.       Legal Standard for a Preliminary Injunction**

8           1.  Federal Rule of Civil Procedure 65 permits the issuance of a preliminary injunction to

9   preserve the positions of the parties until a full trial can be conducted.  *LGS Architects, Inc. v.*

10  *Concordia Homes*, 434 F.3d 1150, 1158 (9th Cir. 2006) (*citing University of Texas v. Camenisch*,

11  451 U.S. 390, 395 (1981)).  In all cases, the burden of persuasion remains with the party seeking

12  preliminary injunction relief.  Hon. William R. Schwarzer, et al., Federal Civil Procedure Before

13  Trial § 13:159 (2006), *citing West Point–Pepperell, Inc. v. Donovan*, 689 F2d 950, 956 (11th Cir.

14  1982).

15          2.  When a party is seeking a preliminary injunction, he or she must make a "clear showing"

16  of either: "(1) a combination of probable success on the merits and the possibility of irreparable

17  injury, or (2) that serious questions are raised and the balance of hardships tips sharply in favor of

18  the moving party.  These standards 'are not separate tests but the outer reaches of a single

19  continuum.'" *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839-40 (9th Cir.

20  2001) (citation omitted); *City of Angoon v. Marsh*, 749 F.2d 1413, 1415 (9th Cir. 1984).  "These two

21  formulations represent two points on a sliding scale in which the required degree of irreparable harm

22  increases as the probability of success decreases."  *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir.

23  1998) (citation omitted).

24          3.  Consequently, "the less certain the district court is of the likelihood of success on the

25  merits, the more plaintiffs must convince the district court that the public interest and balance of

26  hardships tip in their favor."  *Southwest Voter Registration Educ. Project v. Shelley*, 344 F.3d 914,

27  918 (9th Cir. 2003) (*en banc*) (*per curiam*) (citation omitted); *see also Miller v. California Pac.*

28  *Med. Ctr.*, 19 F.3d 449, 456 (9th Cir. 1994) (*en banc*) (citations omitted).

1    4.  The grant of a preliminary injunction is the exercise of a very far reaching power never to

2    be indulged except in a case clearly warranting it.  *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir.

3    1970).

4    **II.      First Cause of Action**

5        1.  NEPA requires federal agencies proposing "major [f]ederal actions significantly affecting

6    the quality of the human environment" to prepare a detailed written EIS.  42 U.S.C. § 4332(2)(c).

7    Where an agency is unsure whether an action is likely to have a significant impact on the

8    environment such that an EIS is necessary, it may prepare an EA discussing the need for the

9    proposed action, alternatives, and the environmental impacts of the proposed action and alternatives.

10   40 C.F.R. § 1508.9.

11       2.  In their First Cause of Action, Plaintiffs contend that the Federal Defendants violated

12   NEPA by failing to prepare an EA or EIS to evaluate the direct, indirect, and cumulative impacts of

13   the Conceptual Strategy, and failing to consider reasonable alternatives or mitigation measures prior

14   to implementing the Conceptual Strategy.  (FAC ¶¶ 36, 37.)

15       3.  To assert a claim for a violation of NEPA, a claimant must bring the action under § 10(a)

16   of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.  *See Lujan v. Nat'l Wildlife Fed'n*,

17   497 U.S. 871, 882 (1990).  This section of the APA contains two requirements.  First, the claimant

18   must identify some agency action that has adversely affected him.  *Id.*  "Second, the party seeking

19   review under §702 must show that he has 'suffer[ed] legal wrong' because of the challenged agency

20   action, or is 'adversely affected or aggrieved' by that action 'within the meaning of a relevant

21   statute.'"  *Id.*

22       4.  As to the first requirement, pursuant to 5 U.S.C. §701(b)(2), the meaning of "agency

23   action" for purposes of §702 is set forth in 5 U.S.C. § 551(13), which provides that agency action is

24   "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial

25   therefore, or failure to act."  *Id.*

26       5.  When the claimant seeks review under the general review provisions of the APA, as

27   Plaintiffs do here, the agency action must be "final agency action."  *Id.* (citing 5 U.S.C. §704).  The

28   Supreme Court has explained that for an agency action to be "final," two conditions must be met.

*See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997).  "First, the action must mark the 'consummation' of the agency's decisionmaking process[] - it must not be of a merely tentative or interlocutory nature.  And second, the action must by one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

6.  Citing *Hall v. Norton*, 266 F.3d 969, 975 n.5 (9th Cir. 2001), Plaintiffs argue that the Federal Defendants' decision that NEPA did not apply to the Conceptual Strategy constitutes final agency action under the APA.  *Hall*, however, is distinguishable from the instant matter.  There, the defendant prepared an EA and issued a FONSI concerning a land exchange.  *Id.* at 973.  The Court held that the decision not to prepare an EIS based on the EA and FONSI was the final agency action. *Id.* at 975 n.5.  There is no similar final agency action at issue here.  Rather, as noted in the Court's Order Denying TRO Motion, the Conceptual Strategy is advisory in nature, does not set forth any findings or ultimate determinations regarding the specific requests or development permit applications, and expressly states that permit decisions and BiOps will be made on a case-by-case basis.  (Order at 4.)  Standing alone, the Conceptual Strategy does not purport to embody the consummation of the Federal Defendants' decision-making process about development in the SRSPA subarea as a whole, or any individual development project.  Nor does it determine any rights or obligations.  *See Bennett*, 520 U.S. at 177-78.  As such, the Court finds that the Conceptual Strategy does not reflect a final agency decision, and that the Federal Defendants' determination that NEPA did not apply does not constitute final agency action under the APA.

7.  Moreover, even assuming *arguendo* that there was a final agency decision not to undertake NEPA review of the Conceptual Strategy, the Court finds that any such decision was reasonable.  *Northcoast Environmental Center v. Glickman*, 136 F.3d 660 (9th Cir. 1998) (less deferential standard of reasonableness applies to threshold agency decisions that certain activities are not subject to NEPA's procedures).  In *Northcoast*, the court determined that an inter-agency Port-Orford Cedar ("POC") Action Plan was not major federal action triggering NEPA.  *Id* at 670. More particularly, the Court found that the Action Plan set forth guidelines and goals for POC research, management strategies, and information sharing, and management strategies and goals for

1   dealing with POC preservation and timber sales, but did not provide for specific activities with a

2   direct impact on the POC.  *Id.*  Nor did the Action Plan propose any site-specific activity or call for

3   specific actions directly impacting the environment.  *Id.*  Similarly here, the two page Conceptual

4   Strategy does not propose any specific projects or purport to make decisions regarding permit

5   applications.  It does not commit the Federal Defendants to any particular course of action, or

6   constitute an irretrievable and irreversible commitment of resources.  *See Friends of Southeast's*

7   *Future v. Morrison*, 153 F.3d 1059, 1063 (9th Cir. 1998) (defendants not required to prepare EIS for

8   tentative operating schedule absent an irretrievable and irreversible commitment of resources).

9   Rather, the Conceptual Strategy provides advice and guidance while making clear that permit

10  decisions and BiOps will be made on a case-by-case basis.  As such, the Court finds that the

11  Conceptual Strategy was not major federal action, and therefore any decision by the Federal

12  Defendants that NEPA does not apply to the Conceptual Strategy was reasonable.

13        8.  The Court also rejects Plaintiffs' argument that their "challenge to individual development

14  projects that rely upon the [Conceptual] Strategy (in the Second and Fourth Causes of Action in their

15  Complaint) renders Plaintiff's separate challenge to the underlying [Conceptual] Strategy (in the

16  First Cause of Action) justiciable as final agency action under the APA." (Plfs' Proposed Findings of

17  Fact and Conclusions of Law ¶ 3(b).)  Plaintiffs cite to *Neighbors of Cuddy Mt. v. Alexander*, 303

18  F.3d 1050, 1066-67 (9th Cir. 2002), and *Wilderness Society v. Thomas*, 188 F.3d 1130, 1133 (9th

19  Cir. 1999) to support their argument.  However, in *Cuddy Mt.*, the court merely determined that the

20  plaintiffs could, in effect, indirectly challenge a broad programmatic plan within the context of

21  challenges to site-specific applications.  303 F.3d at 1067-69.  There, the plaintiffs challenged only a

22  specific timber sale, and pointed to general Forest Service Practices as evidence that the particular

23  sale was unlawful.  *Id.* at 1069.  Similarly, in *Wilderness Society*, the court concluded that the

24  plaintiff's general challenge to a Forest Plan was not justiciable, but claims challenging site-specific

25  injury were.  188 F.3d at 1134.  Also instructive on this issue are *Northcoast Environmental Center*,

26  and *Kern v. U.S. Bureau of Land Management*, 284 F.3d 1062 (9th Cir. 2002).  In *Northcoast*, the

27  court determined that although the POC Action Plan was not itself final agency action or major

28  federal action, where a site-specific proposed action triggered NEPA requirements, the defendants

United States District Court

For the Northern District of California

1   would not be able to "tier" their site-specific EISs back to the POC Action Plan since it had not,

2   itself, undergone NEPA analysis.  136 F.3d at 662, 670.  *Kern* involved such cite-specific

3   challenges.  284 F.3d at 1069.  In *Kern*, the plaintiffs argued that an EIS prepared for a Resource

4   Management Plan, and an EA prepared for a timber sale violated NEPA because rather than

5   analyzing the impact of a particular fungus on the POC, the EIS and EA merely referred to the

6   guidelines set forth in the POC Action Plan and contained no independent analysis.  *Id.*  Of note, the

7   court did not hold that site-specific applications converted the POC Action Plan itself into a final

8   agency action reviewable under the APA, or major federal action subject to NEPA.  Instead, the

9   court analyzed the EIS and EA at issue without reference to the POC Action Plan guidelines to

10   determine if each, standing alone, was sufficient.  *Id.* at 1073-75.

11   9.  Here, Plaintiffs' First Cause of Action is aimed at the Conceptual Strategy itself.  Indeed,

12   Plaintiffs seek a declaration that the adoption of the Conceptual Strategy violates NEPA.  (FAC at

13   18, ¶ 1.)  While Plaintiffs' challenges to the individual EAs may, in effect, force the Federal

14   Defendants to reevaluate their use of the Conceptual Strategy, site specific applications of the

15   Conceptual Strategy do not somehow convert the Strategy itself into a reviewable final agency

16   action, or major federal action triggering NEPA.

17   10.  Because the Conceptual Strategy does not constitute final agency action or major federal

18   action, the Court concludes that Plaintiffs have not shown that they are likely to succeed on their

19   First Cause of Action.

20   **III.   Second Cause of Action**

21   1.  Under The Clean Water Act section 404(a), the Secretary of the Army ("Secretary"),

22   acting through the Corps, has authority to issue permits for the discharge of dredged or fill material

23   into waters of the United States.  33 U.S.C. § 1344(a) and (d).  The Corps' issuance of section 404

24   permits for individual development projects is considered major federal action under NEPA and,

25   therefore, the Corps was required, at the least, to prepare an EA for each project.  *See Tillamook*

26   *County v. U.S. Army Corps of Engineers*, 288 F. 3d 1140, 1142 (9th Cir. 2002).

27   2.  In an EA, the agency must consider the direct, indirect, and cumulative impacts of the

28   proposed activities as well as the significance of those impacts on the human environment.  40

United States District Court

For the Northern District of California

1  C.F.R. §§ 1508.7, 1508.8, 1508.27(b).  If the agency determines the proposed action will not

2  significantly affect the environment, the agency may issue a FONSI, and proceed with the action.  40

3  C.F.R. § 1508.13; *Klammath-Siskiyou Wildlands Center v. Bureau of Lang Management* ("*KSWC*"),

4  387 F.3d 989, 993 (9th Cir. 2004).  In sum, the agency must take a "hard look" at the potential

5  environmental consequences of a proposed action.  (*Id.*)

6      3.  Plaintiffs' Second Cause of Action is against the Corps for "Violation of NEPA for

7  Unlawful Environmental Assessments."  In essence, Plaintiffs challenge the section 404(b) permits

8  issued by the Corps on the grounds that the EA/FONSIs prepared before permits were issued do not

9  reflect independent and adequate assessments of the cumulative impacts of the development

10 projects, and do not consider an adequate range of conservation alternatives for each project.  (Plf's

11 Amended MPA at 21:21-24.)  Defendants, on the other hand, aver that the Corps took the necessary

12 "hard look" at the environmental consequences of each development project.  *See KSWC*, 387 F.3d

13 at 993.

14     4.  An agency's decision that the proposed action will not have a significant effect on the

15 environment may only be overturned if the decision is arbitrary and capricious.  *See National*

16 *Audubon Society v. Hester*, 801 F.2d 405, 407 (D.C. Cir. 1986), *see also Citizens to Preserve*

17 *Overton Park v. Volpe*, 401 U.S. 402, 415-417 (1971).  The question for this Court is not whether

18 the agency's decision was "correct," but rather whether the decision reflects sufficient attention to

19 environmental concerns and is adequately reasoned and explained.  *National Audubon Society*, F.2d

20 at 407, *citing Baltimore Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983). The Court is not

21 empowered to substitute its judgment for that of the agency.  *Klammath-Siskiyou*, 387 F.3d at 993,

22 *citing Volpe*, 401 U.S. at 416.

23     **A.      Adequacy of the EAs**

24     a.  An EA is a "concise public document" meant to "[b]riefly provide sufficient evidence and

25 analysis for determining whether to prepare an environmental impact statement or a finding of no

26 significant impact" 40 C.F.R. §1508.9.  An agency can use environmental information submitted by

27 a permit applicant.  40 C.F.R. §1506.5(a); *San Francisco Bay Keeper v. U.S. Army Corps of*

28 *Engineers*, 219 F.Supp.2d 1001, 1012 (N.D. Cal. 2002).  In reviewing such information, the agency

United States District Court

For the Northern District of California

does not have to redo the work, but it must independently analyze and verify the information, and be responsible for its accuracy.  *Id.*; *see also* 40 C.F.R. §1502.21 (agencies shall incorporate material into an EIS by reference when the effect will be to cut down on the bulk of the EIS without impeding agency and public review of the action).  In addition, tiering - avoiding a detailed discussion by referring to another document containing the required discussion - is permitted.  40 C.F.R. §1502.20; *Kern*, 284 F.3d at 1073.  "However, tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA."  *Kern*, 284 F.3d at 1073; *see Northcoast*, 136 F.3d at 670.

**Cumulative Impacts:**

b.  In *KSWC*, the Ninth Circuit provided guidance on the appropriate level of analysis that an EA should reflect.  Particularly, "[a] proper consideration of the cumulative impacts of a project requires some quantified or detailed information; ... [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  387 F.3d at 993 (internal quotes and citations omitted).  The court found timber sale EAs inadequate because, rather than providing an objective quantification of the impacts, the EAs only stated if certain environmental factors would remain the same, be downgraded, or be improved, and if the change would be major or minor.  *Id.* at 994.  In addition, the EAs did not disclose what data the conclusions were based on.  *Id.*  Further, the only information about future foreseeable actions was a tabulation of the total number of acres to be harvested.  *Id.* at 994-95.  While such a tabulation is a component of a cumulative impacts analysis, the court admonished that it was not a sufficient description of the expected environmental effects of such harvesting.  *Id.* at 995.  The court also rejected the defendant's argument that the scant amount of information in the EAs was sufficient to agency specialists to determine that the cumulative impacts would not be significant.  *Id.* at 996.  In doing so, the court acknowledged that the conclusions of agency experts are entitled to deference, but the agency must still provide sufficient data to support its conclusions and permit meaningful public scrutiny.  *Id.*  Finally, the EAs could not be saved by tiering to an EIS that likewise failed to analyze the specific impacts of the timber sales, and tiering to a Watershed Analysis that had not undergone NEPA scrutiny was impermissible.  *Id.* at 997-98.

24

United States District Court

For the Northern District of California

c.  Bearing in mind that the standard of review is a deferential one, the Court nevertheless concludes that the EAs at issue here suffer from similar deficiencies.  Each EA describes the direct and indirect impacts that a specific project will have on the jurisdictional waters of the U.S. by listing the number of acres impacted.  However, while one might assume that the direct impact to waters on the project site is dewatering, the EAs are unclear about the nature of the indirect impacts to neighboring property vernal pools and the associated watersheds.  Moreover, a mere tabulation of the number of acres impacted is not a sufficient analysis of the specific environmental impacts of a proposed action.  *See KSWC*, 387 F.3d at 994-95.  And while the EAs acknowledge that other projects in the SRSPA were reasonably foreseeable such that the Corps could assume that the cumulative effects of the projects were related, the EAs do not quantify the extent of the impacts for all related projects or discuss the nature of these impacts.

d.  Instead, the summary of cumulative impacts in each EA describes what a cumulative impact is under the regulations, and then states that the detailed analysis in the Regional Alternatives Analysis and the Conceptual Strategy address potential cumulative effects.  (Second Segall Decl. Exh. 1 at 20-21, Exh. 2 at 26-27, Exh. 3 at 26-27, Exh. 4 at 16, Exh. 5 at 13-14; Segall Decl. Exh. I at 18-19; Birkey Decl., Exh. O at 21-23.)  The Corps may incorporate information by reference, but it must still engage in an independent analysis of the information.  40 C.F.R. §1506.5(a); *San Francisco Bay Keeper*, 219 F.Supp.2d at 1012.

e.  Here, even if the Regional Alternatives Analysis sufficiently addresses the cumulative impacts of the proposed projects, there is nothing in each EA showing how the Corps independently evaluated this information, nor how the Corps made a rational connection between the facts and its endorsement of the Conceptual Strategy Preserve.[3]  Indeed, the EAs merely note that the applicants submitted the Regional Analysis to identify regional and sub-regional cumulative impacts, and that the document analyzes the Conceptual preserve and eight other preserve alternatives according to criteria for minimizing jurisdictional impacts and providing connected reserve areas in light of cost,

---

[3]In the Regional Alternatives Analysis, the first criteria for evaluating each proposed preserve configuration is whether the configuration "[r]esults in direct impacts to waters of the U.S. that are less than or equal to that of the Conceptual Strategy alternative."  Since the Conceptual Strategy itself has not been subject to NEPA review, the Court would have expected some discussion in the EAs about how the Corps determined that the Conceptual Strategy preserve set an appropriate impacts "ceiling."

**United States District Court**
For the Northern District of California

1    logistics, and existing technology.  (Second Segall Decl. Exh. 1 at 6, Exh. 2 at 6, Exh. 3 at 6, Exh. 4

2    at 5, Exh. 5 at 5; Segall Decl. Exh. I at 5; Birkey Decl., Exh. O at 5.)  There is no substantive

3    discussion about the nature or extent of the potential cumulative impacts, or any independent

4    analysis of the Regional Alternatives Analysis' findings.

5        f.  Similarly, although the EAs discuss the benefits of implementing the Conceptual

6    Strategy's principles and guidelines and preserve map (Second Segall Decl. Exh. 1 at 21, Exh. 2 at

7    26-27, Exh. 3 at 27-28, Exh. 4 at 16-17, Exh. 5 at 14; Segall Decl. Exh. I at 18-19; Birkey Decl.,

8    Exh. O at 22-23), there is nothing reflecting the objective data the Corps utilized in concluding that

9    these measures would help reduce cumulative impacts below a significant level.  *See KSWC*, 387

10   F.3d at 996 (agency must provide sufficient data to support its conclusions and permit meaningful

11   public participation in decision making process); *Oregon Natural Resources Council v. U.S. Bureau*

12   *of Land Mgmt.*, 470 F.3d 818, 822 (9th Cir. 2006) (agency must disclose and consider quantified and

13   detailed information in an EA).

14       g.  Moreover, even assuming *arguendo* that the Regional Alternatives Analysis and

15   Conceptual Strategy contain a sufficient discussion on cumulative impacts, the Corps cannot avoid a

16   detailed cumulative impacts discussion in each EA by referring to these documents since neither has

17   been subject to NEPA review.  *See Kern*, 284 F.3d at 1073, *Northcoast*, 136 F.3d at 670, *KSWC*, 387

18   F.3d at 997-98.

19       h.  In light of the above, the Court finds that Plaintiffs have raised a serious question as to

20   whether the Corps took the requisite "hard look" at the cumulative impacts of the proposed

21   development projects.

22       **Alternatives Analysis:**

23       i.  The Corps was required to consider a range of reasonable alternatives in each EA.  *See* 40

24   C.F.R. § 1508.9, *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 812 (9th Cir.1999),

25   *Friends of the Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

26       j.  The Court finds that the EAs adequately discusses a reasonable range of on-site

27   alternatives for each proposed project.  Although each on-site alternatives evaluation is based on the

28   section 404(b)(1) alternatives analyses provided by the applicants, the Corps sufficiently summarizes

the information provided and gives some indication as to why the applicant's preferred choice is the Corps selected choice.  (Second Segall Decl. Exh. 1 at 6-8, Exh. 2 at 9-12, Exh. 3 at 10-12, Exh. 4 at 5-7, Exh. 5 at 5-7; Segall Decl. Exh. I at 7-8; Birkey Decl., Exh. O at 7-9.)

k.  However, the Court again finds it problematic that there is no discussion by the Corps of the Regional Alternatives Analysis that elucidates how the Corps evaluated the information provided by the applicants, nor how the Corps concluded the Conceptual Preserve map was the least environmentally damaging alternative.[4]  The Court, therefore, concludes that the EAs do not reflect the requisite "hard look" at potential alternative preserve configurations, nor do they contain an adequate discussion of why the Corps determined the Conceptual Preserve was the best alternative for avoiding significant environmental impacts.

**IV.    Third Cause of Action**

1.  Plaintiffs bring their Third Cause of Action under the citizen's suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), which provides, "any person may commence a civil suit on his own behalf - - to enjoin any person, including the United States and any other governmental instrumentality or agency [], who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof[.]"

2.  Plaintiffs allege that Defendants violated section 7(a)(2) of the ESA by failing to ensure, through consultation, that the Conceptual Strategy will not jeopardize the continued existence of threatened species.  (FAC ¶ 45.)  16 U.S.C. §1536(a)(2) provides:

> Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

---

[4]To the extent that the Corps' conclusion is based on compliance with the Conceptual Strategy, there should be some discussion about why the Conceptual Strategy guidelines and principles would adequately address the potential environmental impacts of the proposed projects, and how the Corps came to that conclusion.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

3. The Ninth Circuit has advised that courts are to construe the term "agency action" broadly. *See Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1125-26 (9th Cir. 1998); *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055 (9th Cir. 1994). Thus, "[a]n action is an 'agency action' if there is discretionary Federal involvement or control.'" *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1073 (9th Cir. 1996) (quoting *Sierra Club v. Babbitt, Seneca*, 65 F.3d 1502, 1509 (9th Cir. 1995)).

4. In *Marbled Murrelet*, the Ninth Circuit held that the Service did not authorize, fund, or carry out agency action under the ESA when it sent an advisory document to a group of private lumber companies describing how they could avoid take liability under the ESA. 83 F.3d at 1074. The Ninth Circuit held that the plaintiffs had failed to raise serious questions warranting injunctive relief on this issue. Particularly, the court noted found "such advisory activity does not constitute discretionary involvement or control over the [l]umber [c]ompanies' proposed tree harvest operations." *Id.* at 1075. Here, as in *Marbled Murrelet*, the Conceptual Strategy is a non-binding advisory document. As noted in the Order Denying TRO Motion, "the Conservation Strategy does not set forth any of the conditions in mandatory language, and the participating federal agencies lack[] power to enforce the provisions of the document." (Order at 11.) Accordingly, as in *Marbled Murrelet*, the government's advice document does not trigger the consultation requirements of the ESA. *See Marbled Murrelet*, 83 F.3d at 1073-1074.

5. In sum, the Court concludes that Plaintiffs have failed to raise a serious questions that the issuance of the Conceptual Strategy amounted to agency action triggering the ESA's consultation requirements.

**V.      Fourth Cause of Action**

1. Plaintiffs bring their Fourth Cause of Action against the Service challenging the individual BiOps pursuant to the APA.[5] (*Id.* at 12-15.) The BiOps constitute "final agency action"

---

[5]The Federal Defendants attack the Fourth Cause of Action as an impermissible programmatic challenge to the Conceptual Strategy itself. (Fed. Def's Proposed Findings of Fact and Conclusions of Law at ¶¶ 43-45.) Plaintiffs, however, are challenging the individual BiOps, (Plf's Amended MPA 36:18-37:18), and are correct that challenging them all in one suit does not convert their claim into an impermissible programmatic attack. *See e.g., High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 639 (9th Cir. 2004) (rejecting argument of impermissible programmatic challenge to forest management plan where the plaintiffs challenged issuance of multiple special-use permits). Thus, the Court rejects the Federal Defendants'

United States District Court

For the Northern District of California

1    under the APA.  *Bennett*, 520 U.S. at 178.

2        2.  Under the APA, a final agency action may only be held unlawful and set aside if it is

3    "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §

4    706(2)(A).  This deferential standard of review requires that an administrative action be upheld if the

5    agency has "considered the relevant factors and articulated a rational connection between the facts

6    found and the choice made."  *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife Service*, 273

7    F.3d 1229, 1236 (9th Cir. 2001).  In making this determination, "the ultimate standard of review is a

8    narrow one.  The court is not empowered to substitute its judgment for that of the agency."  *Citizens*

9    *to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

10       3.  The ESA requires federal agencies to consult with the Service to ensure that a federal

11   agency's actions are not likely to jeopardize the continued existence of a species listed as threatened

12   or endangered pursuant to the ESA.  16 U.S.C. § 1536 (a)(2).  At the conclusion of such

13   consultation, the Service provides the federal agency with its "biological opinion" regarding whether

14   the proposed action will cause jeopardy to the continued existence of a listed species.  16 U.S.C. §

15   1536 (b)(3)(a).  The Service must use the best scientific and commercial data available when

16   preparing and issuing its biological opinions.  16 U.S.C. § 1536 (a)(2).

17       4.  An agency has wide latitude to determine what is the best scientific and commercial data

18   available.  *Kandra v. U.S.*, 145 F. Supp. 2d 1192, 1208 (D. Or. 2001).  It is presumed that agencies

19   have used the best scientific and commercial data available unless those challenging the agency

20   actions can identify relevant data not considered.  *Id.  (citing Friends of Endangered Species v.*

21   *Jantzen*, 760 F.2d 976, 985 (9th Cir. 1985)).

22       5.  Here, Plaintiffs allege that the Service's decision to issue "no jeopardy" BiOps was

23   arbitrary and capricious because the BiOps fail to incorporate the best available science.[6]  (Plfs'

24   _____

25   argument.

26       [6]Defendants, in opposition to Plaintiffs' request for injunctive relief, address the allegations in the complaint that
     the Service failed to consider the cumulative impacts of the various projects in formulating the BiOps.  The Court does not
27   reach this argument since Plaintiffs do not appear to raise it as a ground for seeking a preliminary injunction.  Instead,
     Plaintiffs' Motion focuses solely on the alleged failure to use the best available science.  (Plf's Amended MPA at 34:18-21)
28   ("Because the administrative records for the Biological Opinions and individual section 404 permits have not yet been
     produced, Plaintiffs focus, for purposes of this motion for interim emergency relief, on just one of the many legal defects,

Amended MPA at 34:3-6, FAC ¶ 49.)  More particularly, Plaintiffs contend that the BiOps are

deficient "because they all ignore the most recent scientific information contained in the Recovery

Plan..." and instead rely on the Conservation Strategy.  (Plf's Amended MPA at 34:23-25.)  To

support their argument, Plaintiff point to the fact that the BiOp for the Douglas Road 103 project

states that the developer's compensation measures to offset direct and indirect impacts of the project

will not meet the goals set forth in the Recovery Plan, yet the Service nonetheless issued a no-

jeopardy opinion.  (*See* Segal Decl. Exh. M at 13 and 15.)

      6.  In *Fund for Animals v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996), the plaintiffs made a

similar argument, to which the court responded:

> There would be absolutely no point to the consultation and preparation
> of a biological opinion if the F.W.S's opinion were predetermined
> based upon whether proposed project lands fell within the borders of
> properties discussed in one of any number of recovery plan
> documents.   The Plaintiffs thus misconstrue the interrelationship and
> legal effect of the 1987 Recovery Plan on the 1995 F.W.S. Biological
> Opinion.

*Id.*  The Court finds this reasoning persuasive.

      7.  Indeed, the jeopardy analysis considers whether a specific action is reasonably likely to

appreciably reduce the likelihood of both survival and recovery of a listed species.  50 C.F.R. §

402.02.  Recovery, in turn, is the "improvement in the status of listed species to the point at which

listing is no longer appropriate . . . ."  *Id.*  The jeopardy analysis therefore is concerned with whether

a given federal action at the species level would appreciably <u>reduce</u> the likelihood of recovery, not

whether that federal action would itself <u>implement</u> or bring about recovery. As such the fact that a

particular project's mitigation measures will not further the recovery of a species (for example, by

implementing steps set forth in a Recovery Plan) does not mean that the project jeopardizes the

continued existence of species, if the project does not actually reduce the likelihood of recovery in

the future.

      8.  Other than the Recovery Plan, Plaintiffs have not identified any scientific data which they

without waiving their ability to address other EAS flaws at summary judgment or trial on the merits.").)

contend the Service ignored.[7]  That Plaintiffs disagree with the Service's decisions does not render those decisions arbitrary and capricious.  *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 975 (9th Cir. 2006) (that the plaintiff's consultant disagreed with an agency conclusion does not render the conclusion arbitrary and capricious).  In sum, the Court finds that Plaintiffs have, at this stage, failed to raise a serious question on their Fourth Cause of Action.

## VI.    Irreparable Harm/Balance of the Hardships

1.  Merely establishing a procedural violation of NEPA does not compel the issuance of a preliminary injunction.  *Fund for Animals v. Lujan*, 962 F.2d 1391, 1400 (9th Cir. 1992).  Indeed, the failure to thoroughly evaluate the environmental consequences of a proposed action does not automatically give rise to a presumption of irreparable harm.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).  However:

> [e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.

*Id.*

2.  As a preliminary matter, citing to *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1035 (9th Cir. 2005), Plaintiffs argue that the Federal Defendants have the burden of showing that an ESA or NEPA violation is not jeopardizing a listed species.  (Plf's Amended MPA at 39:7-12.)  In other words, Plaintiff's argue that Defendants must show lack of irreparable harm to prevent the issuance of an injunction.  *Washington Toxics*, however, involved an ESA violation, not a NEPA violation.  There, the court held that placing the burden on the agency to prove the action is

---

[7]Of note, there is no evidence that the Service "ignored" any of the scientific information in the Recovery Plan. Rather, Plaintiffs appear to presume that the Service ignored the Recovery Plan because the BiOps issued after the Recovery Plan was promulgated acknowledge that the applicant's proposed mitigation measures are not entirely consistent with goals set forth in the Recovery Plan.  However, a Recovery Plan is a guidance document, not a regulatory documents.  *Fund for Animals*, 85 F.3d at 547; see also Uram Decl. Exh. 3 [Recovery Plan] at J-2 (Recovery Plans are guidance documents, not regulatory documents), J-4 ("Recovery plans are not land use plans and cannot restrict activities proposed by other agencies or the public." "Recovery plans may be used to provide guidance, or as a reference, for section 7 consultations.") J-29 ("Although recovery plans may provide guidance on protection of existing habitat, they are not the appropriate forum for discussing specific proposals.").  As such, the Service was not obligated to "implement" the goals of the Recovery Plan via the BiOps, and the fact that no-jeopardy BiOps were issued that acknowledged inconsistencies between the mitigation proposals and Recovery Plan goals does not amount to evidence that the Service ignored relevant science in completing its BiOps.  In fact, the two BiOps issued after the Recovery Plan was finalized refer to the Recovery Plan (Segall Decl., Exh. M at 22, Exh. N at 28, Exh. O at 29), suggesting that the Service did consider it.

United States District Court

For the Northern District of California

1   non-jeopardizing is consistent with the purpose of the ESA and its "institutionalized caution

2   mandate[ ]." *Id.,* quoting *Sierra Club v. Marsh*, 816 F.2d 1376, 1389 (9th Cir. 1987).[8]  Here, the

3   Court has found that Plaintiffs have raised a serious question on a NEPA claim, not an ESA claim.

4   Plaintiffs have not provided any legal support for the notion that deviations from the traditional

5   injunction inquiry appropriate in the ESA context apply equally to alleged NEPA violations.  Indeed,

6   in *Fund for Animals*, which involved a NEPA violation, the Ninth Circuit upheld the district court's

7   findings that *the plaintiff* failed to show irreparable harm or a balance of the hardships tipping in the

8   plaintiff's favor. 962 F.2d at 1400.  Similarly, the Court finds that it is incumbent upon Plaintiffs to

9   make this showing to obtain a preliminary injunction pursuant to their NEPA claim.

10       3.  In that vein, Plaintiffs argue that irreparable harm is inevitable because a significant

11   percentage of vernal pool wetlands will be permanently destroyed by the permitted projects before

12   this case can be heard on the merits.  Plaintiffs offer evidence that only 10 percent of vernal pool

13   wetlands remains statewide (Thorpe Decl. ¶ 10), and argue that according to the Recovery Plan,

14   "[n]inety-five percent of the region must be preserved to ensure the survival and recovery of the two

15   listed species." (Plf's Amended MPA at 38:28-39:1.)  The Court notes, however, that the pages of

16   the Recovery Plan cited to by Plaintiffs actually state that to delist the slender Orcutt grass and

17   Sacramento Orcutt grass, 95 percent of the Mather Core region should be preserved. (Segall Decl.

18   Exh. A at III-99.)  Eighty-five percent of the Mather Core region should be preserved to *delist* the

19   vernal pool fairy shrimp. (*Id.* at III-104.)  And as for delisting the vernal pool tadpole shrimp, the

20   table Plaintiffs makes reintroduction/introduction recommendations rather than providing a habitat

21   preservation goal. (*Id.* at III-106.)

22       4.  Defendants argue that Plaintiffs cannot show irreparable injury because the

23   implementation of mitigation measures required by each section 404(b) permit will offset any

24   environmental impacts and "replace any lost functions and values within the permit area." (Sunride-

25   Anatolia/Arista Del Sol Intervenor's Opp. at 22:3-10.)  Defendants also point to testimony from

26   Kenneth Witney, Ph.D., a wetlands biologist, that a combination of preservation and

27

28       [8]In *Sierra Club*, the Ninth Circuit made clear that the ESA forecloses the court's exercise of equitable discretion in evaluating the propriety of an injunction for an ESA violation.  F.2d at 1383-84.

**United States District Court**
For the Northern District of California

1   restoration/creation of vernal pools can sufficiently prevent irreparable harm to vernal pool species

2   and wetland habitat and functions.  (*See e.g.*, Witney Decl. ¶ 19.)  Plaintiffs respond that the Service

3   itself concedes that mitigation is not adequate to offset the loss of natural vernal pool habitat:

> Given the uncertainties associated with vernal pool creation, the
> Service maintains that transplanting target species . . . into artificial
> pools cannot be considered adequate replacement for the loss of
> occupied vernal pool habitat.  Even if such transplantation o f the fairy
> shrimp and vernal pool tadpole shrimp and creation of their habitat
> were documented to be a proven procedure rather than an evolving
> problematic venture, artificial pool creation for the species . . .  would
> not fulfill the mandates of section 2 of the Act which require the
> Service to develop programs that conserve the ecosystems upon which
> the listed species depend.  As discussed elsewhere herein, natural
> habitats throughout the ranges of the four species have been damaged
> or eliminated.  As a result, the Service concludes that the continued
> survival and recovery of the three fairy shrimp and the tadpole shrimp
> only can be assured at this time, by the preservation of extent vernal
> pools and their associated watersheds.

12  Segall Decl. Exh. C [59 Fed. Reg. 48,136 (September 19, 1994)].)  Plaintiffs also point out that the

13  Southern District of California has held that the creation of off-site vernal pools is ineffective and

14  unacceptable mitigation.  *Southwest Center for Biological Diversity v. Bartel*, 2006 WL 3914425, *5

15  (S.D.Cal. 2006).

16      5.  This notwithstanding, Defendants aver that Plaintiffs have not established that mitigation

17  "cannot" offset losses, and argue that this failure of proof and the "crippling financial harms" the

18  Defendant Intervenors will suffer if an injunction issues (*see e.g.*, Galovan Decl. ¶ 9; Ellis Decl. ¶¶

19  6-7), tips the balance of the equities sharply in their favor.  Moreover, Defendants point out that in

20  deciding whether to issue an injunction that would affect the public interest, a district court must

21  expressly consider the public interest.  *Northern Cheyenne Tribe v. Hodel*, 851 F.2d 1152, 1157 (9th

22  Cir. 1988) (*citing American Motorcyclist Association v. Watt*, 714 F.2d 962, 965, 967 (9th

23  Cir.1983)).  They urge the Court to consider that enjoining the development projects will result in a

24  loss of tax revenue and amenity benefits to the City of Rancho Cordova that is slated to fund

25  infrastructure improvements and city services, and will deprive the City of needed housing.

26      6.  Having considered the parties' arguments and the evidence submitted, the Court

27  concludes that the balance of the hardships favors Plaintiffs.  Although the Court recognizes the

28  economic ramifications to both the Defendant Intervenors and the City of Rancho Cordova that will

1   result from  a preliminary injunction, it is beyond dispute that vernal pool habitat will be

2   permanently destroyed in the development process.  The risk of such permanent destruction absent

3   the benefit of an adequate cumulative impacts or alternatives analysis under NEPA tips the balance

4   of the hardships in Plaintiffs' favor.  That, combined with the uncertainties associated with the

5   probability of successfully offsetting the loss of natural vernal pools through vernal pool creation

6   reinforces the Court's conclusion that irreparable harm is sufficiently likely to warrant interim

7   injunctive relief.

8   **VII.    Bond Requirement**

9          Defendants request, in the event that the Court issues a preliminary injunction, that Plaintiffs

10  be required to post a bond pursuant to Federal Rule of Civil Procedure 65(c).  Plaintiffs respond that

11  they are public interest groups that do not have the resources to post a bond, and that the Court

12  should exercise its discretion to dispense with the security requirement.  In support of this position,

13  Plaintiffs submit the declaration of the former President of the Board for Plaintiff California Native

14  Plant Society, which states:

15              The California Native Plant Society and other plaintiffs in this case are
                public-benefit, non-profit groups with limited budgets.  We have not
16              anticipated the need, nor budgeted, for bonds to carry out our public
                interest advocacy work related to resource protection law enforcement.
17              Any requirement for a bond would overly burden our resources to the
                extent of having to lay-off administrative and scientific personnel who
18              are engaged in work totally unrelated to the case at hand.

19  (Supp. Witham Decl. ¶ 2.)

20         District courts has discretion to dispense with the security requirement, or to request mere

21  nominal security, where requiring security would effectively deny access to judicial review.  *Save*

22  *Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (recognizing "long-standing

23  precedent that requiring nominal bonds is perfectly proper in public interest litigation"); *Cal. ex rel.*

24  *Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir.1985) (waiver of

25  security, or requiring only a nominal amount to be posted, appropriate where applicant was a non-

26  profit environmental group unable to post a substantial bond).

27         Here, the Court finds it an appropriate exercise of its discretion to dispense with the security

28  requirement, to ensure that the Court does not thwart public interest litigation, particularly where

United States District Court
For the Northern District of California

34

**United States District Court**
For the Northern District of California

1   Congress has provided for private enforcement of a statute.  Plaintiffs have adequately established

2   that imposition of anything other than a nominal bond would constitute an undue hardship and

3   would frustrate their ability to pursue private enforcement of NEPA requirements.   Moreover, the

4   likelihood of success on the merits, as set forth above, tips in favor of a minimal bond or no bond at

5   all.  Accordingly, the Court will not require Plaintiffs to post a bond in order for a preliminary

6   injunction to take effect.

7   *///*

8

9                                   **CONCLUSION**

10           The Court concludes that the EAs prepared by the Corps prior to the issuance of the Section

11   404(b) permits for the North Douglas, Montelena, Douglas Road 98, Sunridge Park, Anatolia IV,

12   Sunridge Village J, and Grantline 208 are inadequate in that they do not reflect that the Corps took a

13   "hard look" at the environmental consequences of the proposed projects as described herein.  In

14   addition, the Court concludes that, because the dredge and fill activities permitted by the Section

15   404(b) permits would result in the permanent destruction of vernal pools, Plaintiffs have established

16   that irreparable harm will result.  Accordingly, the Court hereby **GRANTS** Plaintiffs' Motion For

17   Preliminary Injunction as follows:

18           The Court hereby **ORDERS** that the force and effect of the Section 404(b) permits for the

19   North Douglas, Montelena, Douglas Road 98, Sunridge Park, Anatolia IV, Sunridge Village J, and

20   Grantline 208 projects is hereby suspended and enjoined pending resolution of this matter on the

21   merits.

22           The Court further **ORDERS** that any further construction, groundbreaking, earthmoving, or

23   other on-the-ground activity that may affect vernal pool habitat or endangered or threatened species,

24   taken in reliance on the Section 404(b) permits for the North Douglas, Montelena, Douglas Road 98,

25   Sunridge Park, Anatolia IV, Sunridge Village J, and Grantline 208 projects, is hereby enjoined

26   pending resolution of the merits of this case.  The Federal Defendants **SHALL** notify all holders of

27   Section 404(b) permits for the North Douglas, Montelena, Douglas Road 98, Sunridge Park,

28   Anatolia IV, Sunridge Village J, and Grantline 208 projects **within forty-eight (48) hours of the**

**United States District Court**
For the Northern District of California

1  **issuance of this Order** and shall direct them immediately to cease and desist all construction,

2  groundbreaking, earthmoving, or other on-the-ground activity in reliance on such permits.

3      Because EAs for the Douglas Road 103 and Arista Del Sol projects were not before this

4  Court at the time of hearing, the Court further **ORDERS** the parties to meet-and-confer regarding

5  the appropriate scope of preliminary injunctive relief, if any – consistent with the findings of fact

6  and conclusion of law set forth herein – that should be entered by this Court with respect to these

7  two projects.  **Within seventy-two (72) hours of the issuance of this Order**, the parties **SHALL**

8  notify the Court as to any stipulated preliminary injunctive relief as to the Douglas Road 103 and

9  Arista Del Sol projects, or (if unable to reach agreement) **SHALL** propose a briefing schedule

10  relating to the disputed issues regarding such preliminary injunctive relief.

11  **IT IS SO ORDERED.**

13  Dated:    7/10/2007

                                          MARTIN J. JENKINS

14                                        UNITED STATES DISTRICT JUDGE